# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CHRISTINA ACHEY,<br>on Behalf of Herself and All Others<br>Similarly Situated,<br><br>          Plaintiff,<br><br>          vs.<br><br>BMO HARRIS BANK, N.A.,<br><br>          Defendant. | **CIVIL ACTION NO.**<br><br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br><br>**RACKETEER INFLUENCED AND<br>CORRUPT ORGANIZATION ACT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Christina Achey, individually and on behalf of the Class described below, by her attorneys, makes the following allegations based upon information and belief, except as to allegations specifically pertaining to Plaintiff and her counsel, which are based on personal knowledge.

## <u>NATURE OF THE ACTION</u>

1. Plaintiff brings this class action against Defendant BMO Harris Bank, N.A. ("BMO" or "Defendant") to recover damages and other relief available at law and in equity on behalf of herself as well as on behalf of members of the class who have been injured by Defendant's participation in a scheme to access and utilize the Automated Clearing House ("ACH") network to collect unlawful debts in violation of 18 U.S.C. § 1962 and the law of numerous states, including Pennsylvania.

2. This is a civil action seeking monetary damages, restitution, and declaratory and injunctive relief from BMO, arising from its participation in schemes to collect on "payday loans" in states that have made payday loans unlawful.

3.     Payday loans—small, closed-end loans due in full on the borrower's next "payday"—have a long and sordid history. For years, unscrupulous lenders have taken advantage of desperate borrowers who are unable to obtain funds anywhere else in order to make ends meet, by offering loans at usurious and unconscionable rates. Payday lenders operate on the shadowy fringe of the mainstream financial system.

4.     At least thirteen states across the nation have either banned payday loans directly or effectively banned them by operation of an interest rate cap. Payday loans are illegal in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, and West Virginia (the "banned states"), and the District of Columbia.

5.     Certain payday lenders—many based offshore or purportedly on Indian reservations—make use of the Internet to circumvent these prohibitions and offer payday loans to consumers residing in these states while ignoring the laws prohibiting those very loans (the "Illegal Online Payday Lenders"). These loans ("Illegal Online Payday Loans") feature interest rates of 400%, 500%, and higher.

6.     Illegal Online Payday Lenders' ability to defy state law rests on the cooperation of financial institutions like Defendant that knowingly "originate" illicit payday loan debits and credits in the mainstream electronic payments system (the "Automatic Clearing House" or "ACH Network"). These banks, known as Originating Depository Financial Institutions ("ODFIs") act as middlemen between illicit Illegal Online Payday Lenders (many based offshore) and the mainstream electronic payments system.

7.     Indeed, it would be impossible for Illegal Online Payday Lenders to deposit payday loan proceeds or debit payday loan payments from customers' bank accounts in states

where the loans are illegal and unenforceable without Defendant's willingness to allow the Illegal Online Payday Lenders to access the ACH Network.

8.     BMO, acting as an ODFI, actively participates in this unlawful scheme by working on behalf of Illegal Online Payday Lenders to "originate" ACH entries that represent payday loan credits and debits to and from consumer checking accounts, thereby enforcing debts BMO knows to be unlawful.

9.     Defendant knows that it is crediting and debiting consumers' accounts for unlawful purposes because it knows it is acting on behalf of Illegal Online Payday Lenders and that the entries it originates on the ACH Network on behalf of such Illegal Online Payday Lenders will credit or debit funds in states in which the Illegal Online Payday Lenders' loans are illegal and unenforceable. Defendant is required by federal banking regulations and the rules of the ACH Network to know the identities of the entities for which it originates transactions and to assure itself that such transactions do not violate state or federal law.

10.     Defendant's illegal schemes with Illegal Online Payday Lenders have victimized Plaintiff and millions of others.  Unless enjoined, Defendant will continue to engage in these schemes and cause substantial injury to consumers.

## PARTIES

11.     Plaintiff is a citizen and resident of Pennsylvania and resides in the borough of Macungie in the city of Allentown and the county of Lehigh.

12.     Defendant BMO is a national banking association incorporated in the State of Delaware with main offices at 111 West Monroe Street, Chicago, Illinois.

## OTHER PERSONS AND ENTITIES

13.　The "Illegal Online Payday Lenders" include, but are not limited to, the following:

    a.　MNE Services, Inc., d/b/a AmeriLoan ("AmeriLoan") purports to be a tribal lending entity owned by the Miami Tribe of Oklahoma and maintains a website with an associated domain name of **www.ameriloan.com** for the purpose of making illegal Illegal Online Payday Loans.  At all times relevant hereto, AmeriLoan engaged in the practice of making and did make illegal payday loans by making such loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright. AmeriLoan is in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

        i.　unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;

        ii.　incurred in connection with the business of lending money at an usurious rate; and

        iii.　the usurious rate was at least twice the enforceable rate.

## JURISDICTION AND VENUE

14.　Plaintiff brings this action pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1964(c) and (d), which confers jurisdiction upon this Court over the subject matter of this action.  This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court in a civil action

arising under federal law. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

15.     Alternatively, this Court has jurisdiction under 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because this lawsuit has been brought as a class action, the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and one or more of the members of the putative Class is a resident of a different state than Defendant.

16.     This Court has personal jurisdiction over every Defendant pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1965.

17.     This Court also has personal jurisdiction over BMO pursuant to 735 Ill. Comp. Stat. 5 / 2-209(4)(b)  in that BMO  is a corporation doing business within this State.

18.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred here and because BMO is subject to personal jurisdiction here.

## BACKGROUND FACTS
### Payday Loans

19.     A payday loan is a short-term (typically a matter of weeks) high fee, closed-end loan, traditionally made to consumers to provide funds in anticipation of an upcoming paycheck. A borrower obtaining a payday loan must either provide a personal check to the lender or an authorization to electronically debit the borrower's deposit account for the loan amount and associated fee as security for the loan.  If the borrower does not repay the loan or make arrangements to extend the loan, the lender can deposit the borrower's check or initiate an electronic withdrawal from the borrower's deposit account.

20.     Payday loans target the most vulnerable and desperate of borrowers, who might not qualify for a conventional unsecured loan or who are in such desperate need of cash that they cannot wait for the formal approval process that a conventional unsecured loan requires.

21.     Payday loans feature exorbitant annual percentage rates (sometimes misleadingly referred to as "fees") and require "balloon" repayments shortly after the loan is made.

22.     If a borrower is unable to repay the full amount of the loan on the due date, the lender typically gives the borrower the option to "roll over" the loan balance by paying another "fee," usually equal to the initial fee at the time of loan funding.  The cycle then continues until such time as the borrower is either able to pay off the loan in full or the borrower defaults on the loan.

23.      Many borrowers repeatedly roll over or take out additional payday loans, often on the same day as a previous one is repaid.  Over 75 percent of payday loan volume is the result of "churn"—borrowers having to take out additional loans to pay off the original debt.

24.     For these and other reasons, Pennsylvania and twelve other states and the District of Columbia have outlawed payday loans.

25.     A loan transaction for $50,000 or less is civilly usurious when it imposes an annual interest rate exceeding 6% per annum. 41 Pa. Stat. Ann. § 201.  By statute, interest charged in excess of this amount is usurious and void.  41 Pa. Stat. Ann. § 502.

26.     Illegal Online Payday Lenders, while not permitted to operate in the  states which have banned payday loans and the District of Columbia, have simply moved to the Internet in order to solicit desperate borrowers in those  states and the District of Columbia into illegal loans using an online application process.  This scheme could not be accomplished without the

complicity of Defendant who provide Illegal Online Payday Lenders with access to the ACH Network.

### The ACH Network

27.     The ACH Network is a processing system in which financial institutions accumulate ACH transactions throughout the day for later batch processing.   Instead of using paper to carry necessary transaction information, such as with checks, ACH Network transactions are transmitted electronically, allowing for faster processing times and cost savings.

28.     The ACH Network processes two types of transactions: Direct Deposits via ACH and Direct Payments via ACH.   "Direct Deposit" via ACH is the deposit of funds for payroll, employee expense reimbursement, government benefits, tax and other refunds, and annuities and interest payments.   It includes any ACH credit payment from a business or government to a consumer.

29.     "Direct Payment" is the use of funds to make a payment via ACH.   Individuals or organizations can make a Direct Payment via ACH as either an ACH credit or ACH debit.   A Direct Payment processed as an ACH credit puts funds into an account. An example of this is when a consumer initiates a payment through his/her bank or credit union to pay a utility bill.   A Direct Payment processed as an ACH debit would be where the utility company takes funds from the customer's account and transfers those funds to the utility company's account.

30.     In 2012, the ACH Network processed more than 21 billion transactions with a total dollar value of $36.9 trillion.   In 2012, the ACH Network processed 9.79 billion ACH debit transactions and 6.96 billion ACH credit transactions.

31.     Rules and regulations that govern the ACH Network are established by NACHA and the Federal Reserve.   NACHA manages the development, administration, and governance of

the ACH Network. BMO is a "Direct Financial Institution Member of NACHA" and influences the governance and direction of the ACH Network and the NACHA Operating Rules by participating in the NACHA Rule Making Process, voting directly on Rules ballots, and by participating in and leading NACHA Councils, committees, and initiatives. As a Direct Financial Institution Member of NACHA, BMO is eligible to serve on the NACHA Board of Directors and further shape regulatory, legislative, and ACH Network policies.

32. An ACH transaction takes place in many steps. First, an accountholder (called a "Receiver") authorizes a transaction with a merchant—the business or person providing a good or service. That merchant (called an "Originator") then communicates the purported authorization to its ODFI. The ODFI is a bank and a member of the ACH Network. The ODFI then transmits the ACH debit or credit through the pass-through "ACH Operator" to the accountholder's bank, known as the Receiving Depository Financial Institution ("RDFI"). The RDFI is also a member of the ACH Network, and is the entity that actually makes the credit or debit on its customer's checking or savings account.

33. There are also "Third Party Service Providers" which are entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries. A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

34. The NACHA Rules specifically require all parties involved in the processing of ACH transactions to adhere to all state and federal laws in the United States. These requirements are meant to keep illicit and unlawful transactions out of the ACH Network.

35.     The NACHA Rules require all participants in the ACH Network to perform risk-based due diligence and monitoring for unlawful transactions and merchants.  The following Policy Statement was adopted by the NACHA Board of Directors on August 22, 2002:

> Fraud and various forms of financial abuse have found their way into every facet of the U.S. payment systems. The NACHA Board believes that the Automated Clearing House Network must maintain the highest standards of fraud prevention to retain the integrity of the payment mechanism and the trust and confidence of its users. Therefore, the NACHA Board resolves and strongly urges that all participants implement adequate control systems to detect and prevent fraud and abusive financial transactions.

36.     NACHA Rules also require specific responsibilities for ODFIs, as discussed below.

### ODFIs Have Special Duties under NACHA Operating Rules and Guidelines

37.     NACHA characterizes ODFIs as "the gatekeepers of the ACH Network."  As the party that enables an Originator—such as Illegal Online Payday Lenders—to initiate debit entries on the ACH Network, NACHA operating rules require an ODFI to enter into an Origination Agreement with each Originator for which it will originate entries on the ACH Network or have an arrangement with a Third-Party Sender that has such an Origination Agreement.  NACHA 2012 Operating Rules, Section 2.2, Subsection 2.2.1.

38.     An ODFI undertakes critical responsibilities under the NACHA Rules that reflect the reliance of the ACH Network on appropriate underwriting and monitoring of Originators by ODFIs.

39.     Under the NACHA Rules, "[a]n ODFI is responsible for all Entries originated through the ODFI whether by an Originator or through a Third-Party Sender . . . [a]n ODFI is responsible for its Originators' and Third-Party Senders' compliance with these Rules." NACHA 2012 Operating Rules, Section 2.1.

40.     NACHA Rules require all ODFIs to conduct a risk assessment of their ACH activities, including, *inter alia*, "assessing the nature of risks associated with ACH activity; performing appropriate know-your-customer due diligence; and having adequate management, information and reporting systems to monitor and mitigate risk." *See* NACHA Operating Guidelines, Chapter 4.

41.     The NACHA Operating Guidelines caution that "ODFIs that choose to originate ACH entries . . . should be aware that both they and their Originators are subject to the NACHA Operating Rules and applicable U.S. law when transmitting these entries." NACHA 2012 Operating Guidelines, Chapter 3 OFAC Requirements and Obligations, OG13.

42.     When an ODFI transmits an ACH entry, it is warranting to each RDFI and ACH Operator that, *inter alia,* the entry has been properly authorized. NACHA 2012 Operating Rules Section 2.4, Subsection 2.4.1.1 (a).

43.     With regard to debit entries from consumer accounts (such as those that represent loan repayments to Illegal Online Payday Lenders), an authorization that is "otherwise invalid under applicable Legal Requirements does not satisfy the requirements" of an "authorization" under the NACHA Rules. NACHA 2012 Operating Rules Section 2.3, Subsection 2.3.2.3 (b).

44.     Further, Subsections 2.2.1.1-2.2.1.2 of the NACHA Rules requires ODFIs to enter into a written agreement with every Third-Party Sender or Originator (or merchant) for whom they originate ACH entries. That agreement is to include an "agree[ment] not to originate Entries that violate the laws of the United States;" a "restriction on the types of entries that may be originated" and must include "the right of the ODFI to audit the Originator's or Third-Party Sender's compliance with the Origination Agreement and these Rules."

45.     Further, ODFIs have clear duties to "know your customer" and the NACHA Operating Rules make clear that they are intended to reflect that principle.   NACHA 2012 Operating Guidelines, Chapter 3 OFAC Requirements and Obligations, OG13.

46.      On March 14, 2013, NACHA issued an advisory in response to certain negative press reports about collusion of ACH members with payday lenders.   In the release, NACHA reiterated the important policing duties of ODFIs:   "[E]ach ODFI is responsible for the valid authorization of every ACH debit processed in its name . . . In the case of authorizations from consumers, the NACHA Rules are explicit that, *inter alia*, the authorization must 'be readily identifiable as an authorization'; and 'have clear and readily understandable terms.'   ***If a purported authorization is invalid under applicable law, it does not meet this standard***." (Emphasis added).

47.     NACHA went on to say:   "Because of these obligations, as well as associated reputational and other risks, the Federal banking agencies advise that ODFIs, among other things, should (i) exercise appropriate risk-based diligence when bringing on new Originators and Third Party Senders and (ii) perform appropriate monitoring to determine whether excessive returns or other suspicious patterns of activity warrant further review or more aggressive action. For example, in 2006 the Office of the Comptroller of the Currency (OCC) released its risk management guidance for ACH activities by national banks, OCC Bulletin 2006-39, in which it cautioned national banks acting as ODFIs to perform a risk-based evaluation of new Originators, including their historic patterns of unauthorized returns and whether they are engaged in legitimate business activities."

48.     The NACHA Operations Bulletin instructed ACH participants as follows: "ACH participants are strongly encouraged to establish business practices that ensure that ACH transactions do not facilitate illegal activity."

49.     In August 2013, NACHA sent a letter to banks warning them that authorizing access to customer accounts for Illegal Online Payday Lenders or their Third-Party Senders could violate NACHA rules.   In the letter, NACHA stated that under its rules, "purported authorizations to pay illegal loans that are unenforceable under applicable state law" are not valid.

**The FDIC Has Issued Guidance to State-Chartered Banks that Enter Into Payment Processor Relationships with Third Parties**

50.     The Federal Deposit Insurance Corporation ("FDIC") regulates state-chartered banks.

51.     On February 25, 2005, the FDIC issued guidance regarding Payday Lending and cautioned that such lending raises "significant risks" for banks, particularly when the payday lenders originate through Third-Party Senders.   The FDIC guidance makes clear that:

> The use of third parties in no way diminishes the responsibility of the board of directors and management to ensure that the third-party activity is conducted in a safe and sound manner and in compliance with policies and applicable laws. Appropriate corrective actions, including enforcement actions, may be pursued for deficiencies related to a third-party relationship that pose concerns about either safety and [sic] soundness or the adequacy of protection afforded to consumers.

52.     On June 6, 2008, the FDIC issued additional "Guidance for Managing Third-Party Risk" which began by noting that:

> An institution's board of directors and senior management are ultimately responsible for managing activities conducted through third-party relationships, and identifying and controlling the risks

arising from such relationships, to the same extent as if the activity were handled within the institution.

53.     Among the risks to banks the FDIC identified in its June 6, 2008 "Guidance for Managing Third-Party Risk" was:

> Compliance risk.  Compliance risk is the risk arising from violations of laws, rules, or regulations, or from noncompliance with internal policies or procedures or with the institution's business standards. This risk exists when the products or activities of a third party are not consistent with governing laws, rules, regulations, policies, or ethical standards. For example, some third parties may engage in product marketing practices that are deceptive in violation of Section 5 of the Federal Trade Commission Act . . .Compliance risk is exacerbated when an institution has inadequate oversight, monitoring or audit functions.

54.     Accordingly, the FDIC advises banks to engage in "Due Diligence in Selecting a Third Party":

> Following an assessment of risks and a decision to proceed with a plan to establish a third-party relationship, management must select a qualified entity to implement the activity or program.  The due diligence process provides management with the information needed to address qualitative and quantitative aspects of potential third parties to determine if a relationship would help achieve the financial institution's strategic and financial goals and mitigate identified risks. Not only should due diligence be performed prior to selecting a third party, but it should also be performed periodically during the course of the relationship, particularly when considering a renewal of a contract.
>
> *****
>
> Comprehensive due diligence involves a review of all available information about a potential third party, focusing on the entity's financial condition, its specific relevant experience, its knowledge of applicable laws and regulations, its reputation, and the scope and effectiveness of its operations and controls.

55.     On January 31, 2012, the FDI C issued revised guidance describing potential risks associated with relationships with third-party entities that process payments for telemarketers, online businesses, and other merchants.  In a footnote to the guidance, the FDIC provided,

"[e]xamples of telemarketing, online businesses, and other merchants that may have a higher incidence of consumer fraud or potentially illegal activities or may otherwise pose elevated risk" which included "payday or subprime loans."

56.     The FDIC advised banks that:

> . . . payment processors that deal with telemarketing and online merchants may have a higher risk profile because such entities have tended to display a higher incidence of consumer fraud or potentially illegal activities than some other businesses. Given this variability of risk, payment processors must have effective processes for verifying their merchant clients' identities and reviewing their business practices. Payment processors that do not have such processes can pose elevated money laundering and fraud risk for financial institutions, as well as legal, reputational, and compliance risks if consumers are harmed.

57.     The FDIC made clear that banks faced potential liability if they failed to adequately manage their relationships with payment processors:

> Deposit relationships with payment processors expose financial institutions to risks not customarily present in relationships with other commercial customers. These include increased operational, strategic, credit, compliance, and transaction risks. In addition, financial institutions should consider the potential for legal, reputational, and other risks, including risks associated with a high or increasing number of customer complaints and returned items, and the potential for claims of unfair or deceptive practices. ***Financial institutions that fail to adequately manage these relationships may be viewed as facilitating a payment processor's or merchant client's fraudulent or unlawful activity and, thus, may be liable for such acts or practices.*** In such cases, the financial institution and responsible individuals have been subject to a variety of enforcement and other actions. ***Financial institutions must recognize and understand the businesses and customers with which they have relationships and the liability risk for facilitating or aiding and abetting consumer unfairness or deception*** under Section 5 of the Federal Trade Commission Act. (Emphasis added).

### The OCC Has Issued Guidance to All Banks
### On Managing the Risks of ACH Activity

58.     The OCC supervises national banks.

59.     On September 1, 2006, the OCC provided guidance for national banks and examiners on managing the risks of ACH activity, explaining that "[n]ational banks may be exposed to a variety of risks when originating, receiving, or processing ACH transactions, or outsourcing these activities to a third party."

60.     The guidance advised:

> High-Risk Activities
>
> Banks that engage in ACH transactions with high-risk originators or that involve third-party senders face increased reputation, credit, transaction, and compliance risks. High-risk originators include companies engaged in potentially illegal activities or that have an unusually high volume of unauthorized returns.
>
> Before a bank engages in high-risk ACH activities, the board of directors should consider carefully the risks associated with these activities, particularly the increased reputation, compliance, transaction, and credit risks. The board should provide clear direction to management on whether, or to what extent, the bank may engage in such ACH activities. Some banks have established policies prohibiting transactions with certain high-risk originators and third-party senders.

61.     In a footnote to the guidance, the OCC made the risk to banks even clearer, "*[r]isks may include the risk of legal liability* or damage to an institution's reputation when *originators or third-party senders facilitate or engage in activities that violate criminal laws*." (Emphasis added).

62.     On April 24, 2008, the OCC provided guidance for national banks and examiners on managing the risks of ACH activity originated by Third-Party Processors, cautioning that:

> Banks should also consider carefully the legal, reputation, and other risks presented by relationships with processors including risks associated with customer complaints, returned items, and potential unfair or deceptive practices. *Banks that do not have the appropriate controls to address the risks in these relationships may be viewed as facilitating a processor's or its merchant client's fraud or other unlawful activity*. (Emphasis added).

63. The guidance reminded banks that they:

> . . . must implement a due diligence and underwriting policy that, among other things, requires an initial background check of the processor and its underlying merchants to support the validity of the processor's and merchants' businesses, their creditworthiness, and business practices.

*****

> By implementing the appropriate controls over processors and their merchant clients, a bank should be able to identify those processors that process for fraudulent telemarketers or other unscrupulous merchants and to ensure that the bank is not facilitating these transactions. In the event a bank identifies fraudulent or other improper activity with a processor or a specific merchant client of the processor, the bank should take immediate steps to address the problem, including filing a Suspicious Activity Report when appropriate, terminating the bank's relationship with the processor, or requiring the processor to cease processing for that specific merchant.

64. The guidance concludes that:

> The OCC supports national banks' participation in payment systems to serve the needs of legitimate processors and the customers of such processors and to diversify sources of revenue. However, to limit potential risk to banks and consumers, banks should ensure implementation of risk management programs that include appropriate oversight and controls commensurate with the risk and complexity of the activities. At a minimum, bank programs should verify the legitimacy of the processor's business operations, assess the bank's risk level, and monitor processor relationships for activity indicative of fraud.

**Defendant Knew the Illegal Online Payday Lenders Were Engaged In Unlawful Activities**

65. At the time BMO originated the entries on the ACH Network referenced herein, it knew the identity of the Illegal Online Payday Lenders, it knew the lenders were engaged in the business of making payday loans, and it knew the Illegal Online Payday Lenders were engaged in the business of making payday loans in states where payday lending was unlawful.

66.     Characteristics of Illegal Online Payday Lender transactions themselves also notified ODFIs of unlawful activity.

67.     Whether ODFIs contract with Illegal Online Payday Lenders or their Third Party Senders, ACH debits originated at the request of Illegal Online Payday Lenders inevitably raise "red flags" to ODFIs which alert them to the fact that potential unlawful activity is occurring.

68.     Chief among these "red flags" are high return rates on ACH debit transactions. An ACH debit transaction may be returned for numerous reasons including, *inter alia*, the account to be debited having insufficient funds or the account owner claiming the debit was not authorized.

69.     ACH debits originated on behalf of the Illegal Online Payday Lenders far exceed the return rate for all electronic payments of less than 1%.

**FACTS AS TO PLAINTIFF CHRISTINA ACHEY**

70.     On or about October 11, 2012, Plaintiff applied for and received a payday loan in the amount of $200 from AmeriLoan by completing an application on the **www.ameriloan.com** website. As part of the application process, Plaintiff authorized AmeriLoan to debit her checking account with People First Federal Credit Union in order to repay the loan.

71.     The interest rate on the loan was 30%.  The entirety of the interest plus principal, which equaled $260, was due 15 days from the date of the loan.

72.     Thus, the nominal annual interest rate on the loan was at least 730%.

73.     Beginning on or about October 26, 2012 AmeriLoan began initiating regular debits from Plaintiff's checking account in Pennsylvania through the ACH Network to repay the loan.

74.     On or about July 10, 2013, Plaintiff applied for and received an additional payday loan in the amount of $350 from AmeriLoan by completing an application on the **www.ameriloan.com** website. As part of the application process, Plaintiff authorized AmeriLoan to debit her checking account with People First Federal Credit Union in order to repay the loan.

75.     The interest rate on the loan was 30%. The entirety of the interest plus principal, which equaled $455, was due 23 days from the date of the loan.

76.     Thus, the nominal annual interest rate on the loan was at least 476.09%.

77.     Beginning on or about August 2, 2013, AmeriLoan (or a Third-Party Sender acting on its behalf) began initiating regular debits from Plaintiff's checking account in Pennsylvania through the ACH Network to repay the loan.

78.     On or about September 13, 2013, AmeriLoan (or a Third-Party Sender acting on its behalf) initiated a debit transaction of $105 for Plaintiff's checking account in Pennsylvania through the ACH Network. The ODFI originating this transaction was BMO.

79.     Defendant BMO derived a benefit through the receipt of fees for its origination of debit entries on the ACH Network initiated by AmeriLoan (or a Third-Party Sender acting on its behalf) and received by Plaintiff.

## CLASS ACTION ALLEGATIONS

80.     <u>Description of the Class and Sub-Class</u>:  Plaintiff brings this class action on behalf of himself and a Class and Sub-Class defined as follows:

> i.      All natural persons within the states of Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia whose accounts were debited via an ACH entry originated by BMO Harris Bank, N.A. as an ODFI on behalf of an Illegal Online Payday

Lender in repayment of a loan which was illegal under the law of their respective state at the time of the debit (the "Class").

ii.     All natural persons within the state of Pennsylvania whose accounts were debited via an ACH entry originated by BMO Harris Bank, N.A as an ODFI on behalf of an Illegal Online Payday Lender in repayment of a loan which was illegal under Connecticut law (the "Sub-Class").

81.     Excluded from the Class and Sub-Class are Defendant's officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns.  Also excluded from the Class and Sub-Class is any judge, justice or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

82.     <u>Numerosity</u>:  The proposed Class and Sub-Class are so numerous that individual joinder of all members is impracticable.

83.     <u>Common Questions of Law and Fact Predominate</u>:  There are many questions of law and fact common to Plaintiff and the Class and Sub-Class, and those questions substantially predominate over any questions that may affect individual Class and Sub-Class members. Common questions of fact and law include (a) whether the Illegal Online Payday Lenders were Illegal Online in violation of state law; (b) whether the Illegal Online Payday Loans were usurious and unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury; (c) whether debts owed to Illegal Online Payday Lenders are incurred in connection with the business of lending money at an usurious rate; (d) whether the usurious rate was at least twice the enforceable rate under the law of the states in which class members reside; (e) whether Defendant's collection of the illegal or unenforceable debt was made with actual or constructive knowledge of the illegality of the loans; (f) whether Defendant' collection of the illegal debt was the proximate cause of the Class's injuries; (g) whether the Class and Sub-Class suffered an injury to property by the debiting of their accounts

by Defendant; and (h) should the running of the statute of limitations for the Class's claims be equitably tolled.

84. <u>Typicality</u>: Plaintiff's claims are typical of the claims of the members of the Class and Sub-Class. Plaintiff and all members of the Class and Sub-Class have been similarly affected by BMO's actions.

85. <u>Adequacy of Representation</u>: Plaintiff will fairly and adequately represent and protect the interests of the Class and Sub-Class. Plaintiff has retained counsel with substantial experience in prosecuting complex and class action litigation. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class and Sub-Class, and have the financial resources to do so.

86. <u>Superiority of Class Action</u>: Plaintiff and the members of the Class and Sub-Class suffered, and will continue to suffer, harm as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the present controversy. Individual joinder of all members of the Class and Sub-Class is impractical. Even if individual class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendant's common course of conduct. The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all class members' claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system, and protects the rights of the class members.

**FIRST CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c) by BMO**
**(On behalf of the Class and Sub-Class)**

87.     Plaintiff incorporates by reference the preceding paragraphs.

88.     BMO is a "person" as defined by 18 U.S.C. § 1961(3).

89.     The ACH Network is comprised of the following participants:

   a.   "Originators" which include individuals, corporations or other entities that initiate entries into the ACH Network, including Illegal Online Payday Lenders;

   b.   "ODFIs" which include all participating financial institutions that originate ACH entries at the request of an Originator or Third Party Service Provider and agree to abide by the NACHA Operating Rules, including BMO;

   c.   "RDFIs" which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

   d.   "Receivers" which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

   e.   "ACH Operators" which include two central clearing facilities, the Federal Reserve Banks and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

   f.   "Third Party Service Providers" which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.   A

"Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

90.     The ACH Network constitutes an "enterprise" pursuant to 18 U.S.C. § 1961(4) as an association of multiple legal entities operating under NACHA.  Alternatively, participants in the ACH Network constitute an "association-in-fact" enterprise as those terms are used in 18 U.S.C. § 1961(4) (**the "ACH Enterprise"**) in that:

    a.  Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

    b.  To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise;

    c.  The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

91.     The ACH Enterprise is an enterprise engaged in and whose activities, including daily volume batch processing of electronic payments across the United States, affect interstate commerce.  BMO is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

92.     BMO, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise.  Under the NACHA Operating Rules, BMO serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through BMO,

whether initiated by an Originator, or by a Third Party Service Provider acting on the Originator's behalf.

93.     In order to initiate debit entries from consumer checking accounts on the ACH network, Illegal Online Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as BMO, and the ODFI must originate the ACH debit.  Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized, meaning that it is, *inter alia*, compliant with the NACHA Operating Rules and state and federal laws.

94.     BMO has used its role within the ACH Enterprise to conduct and participate in the collection of unlawful debts by originating entries on the ACH Network, at the request of Illegal Online Payday Lenders or Third-Party Senders acting on their behalf, which debit the accounts of persons residing in states in which payday lending is illegal.  The loans made by the Illegal Online Payday Lenders are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

      a.  unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;

      b.  incurred in connection with the business of lending money at an usurious rate; and

      c.  the usurious rate was at least twice the enforceable rate.

95.     BMO, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network at the request of Illegal Online Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that BMO knew routinely violate state law; and originated debit

entries that BMO knew were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

96.     Pursuant to the fraudulent scheme, BMO participated in the collection of unlawful debts in that:

    a.  Illegal Online Payday Lenders, or Third-Party Senders acting on their behalf, initiated the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

    b.  BMO then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

    c.  BMO knew that the Illegal Online Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Illegal Online Payday Lenders in violation of 18 U.S.C. §1962(c).

97.     Accordingly, BMO has directly and indirectly conducted and participated in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

98.     As a direct and proximate result of BMO's violations of 18 U.S.C. § 1962(c), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by BMO and such injury was reasonably foreseeable.

**SECOND CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(d) by BMO**
**(On behalf of the Class and Sub-Class)**

99.     Plaintiff incorporates by reference the preceding paragraphs.

100.    BMO and Illegal Online Lenders, or Third Party Senders acting on their behalf,

reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday

loans to consumers residing in states that banned the practice and collect usurious interest rates in

violation of state law.  Their endeavor, if completed, would constitute the collection of "unlawful

debts" under 18 U.S.C. § 1961(6) in that the loans are:

    a.  unenforceable under State or Federal law in whole or in part as to principal or

       interest because of the laws relating to usury;

    b.  incurred in connection with the business of lending money at an usurious rate;

       and

    c.  the usurious rate was at least twice the enforceable rate.

101.    In furtherance of their agreement, BMO and Illegal Online Payday Lenders agreed

to take certain acts to facilitate the collection of unlawful debts:

    a.  Illegal Online Payday Lenders, or Third-Party Senders acting on their behalf,

       agreed to initiate the transactions whereby borrowers' bank accounts were

       debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

    b.  BMO agreed to originate ACH entries by which the accounts were debited and

       the unlawful debts collected in violation of 18 U.S.C. §1962(c);

    c.  BMO knew that the Illegal Online Payday Lenders were payday lenders and

       that payday loans were illegal and unenforceable in Arizona, Arkansas,

       Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York,

North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Illegal Online Payday Lenders in violation of 18 U.S.C. §1962(c).

102. Accordingly, BMO intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

103. As a direct and proximate result of BMO and Illegal Online Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by BMO and such injury was reasonably foreseeable.

## THIRD CLAIM FOR RELIEF
### Assumpsit against Defendant
### (On behalf of the Sub-Class)

104. Plaintiff incorporates by reference the preceding paragraphs.

105. Defendant BMO received funds belonging to Plaintiff and the Sub-Class.

106. Defendant BMO's receipt of money belonging to Plaintiff and the Sub-Class was improper because the money represented repayments of interest that was greater than 6% per annum.

107. Defendant BMO benefited from receipt of the funds.

108. Plaintiff and the Sub-Class are entitled to return of the funds which represented repayments of interest greater than 6% per annum received by BMO.

109.    Because the funds received from Plaintiff and the Sub-Class are, upon information and belief, no longer in the possession of BMO, Plaintiff has a right to restitution *at law* from BMO.

### FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Pennsylvania Maximum Interest Rates Statute
### (On Behalf of the Sub-Class)

110.    Plaintiff incorporates by reference the preceding paragraphs.

111.    Pursuant to  41 Pa. Stat. § 201, the maximum lawful interest rate for all loans in the amount of fifty thousand dollars ($50,000) or less is 6% per annum.

112.    Pursuant to 41 Pa. Stat. § 502, all interest charged on loans at a rate greater than 6% per annum is prohibited. "A person who has paid a rate of interest for the loan or use of money at a rate in excess of that provided for by this act or otherwise by law or has paid charges prohibited or in excess of those allowed by this act or otherwise by law may recover triple the amount of such excess interest or charges in a suit at law against the person who has collected such excess interest or charges."

113.    As set forth more fully above, in the course of collecting payments on illegal payday loans in Pennsylvania, Defendant repeatedly and knowingly collected interest at a rate greater than 6% per annum in violation of 41 Pa. Stat. Ann. § 201.

114.    Defendant aided and abetted the Illegal Online Payday Lenders' violations of Pennsylvania usury law.

115.    On the dates specified above, Defendant credited and debited money from Plaintiff's checking accounts and electronically transmitted it to the Illegal Online Payday Lenders (or Third-Party Senders acting on their behalf).

116.    In making these debits, credits and transmissions, Defendant knowingly provided substantial assistance to—and profited from—the illegal lending activities of the Illegal Online Payday Lenders.

117.    At the time BMO made these electronic withdrawals and transfers, it knew the identity of the Illegal Online Payday Lenders, including their unlawful activity.

118.    Defendant was prohibited by NACHA Rules from honoring ACH transactions on unlawful payday loans.

119.    Defendant was aware of the illegal nature of the lending activities of the Illegal Online Payday Lenders through due diligence procedures.

120.    At the time BMO transmitted these funds it knowingly assisted the Illegal Online Payday Lenders and were incentivized to do so by a bare profit motive.

121.    As a result of Defendant's knowing participation in the making of illegal payday loans, it is liable as an aider and abettor to the violations of the Pennsylvania usury law referenced herein.

## FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of the Pennsylvania Consumer Credit Statute
#### (On Behalf of the Sub-Class)

122.    Plaintiff incorporates by reference the preceding paragraphs.

123.    Pursuant to the Pennsylvania Consumer Credit Statute, no entity can engage in lending in the amount of $25,000 or less without a license. 7 Pa. Stat. § 6203. Furthermore, pursuant to 7 Pa. Stat. § 6213, lenders duly licensed by the Secretary of Banking of the Commonwealth of Pennsylvania may charge the following on short-term loans:

> [A] corporation licensed under this act shall have power and authority: . . . To charge, contract for, receive or collect interest or discount at a rate not to exceed nine dollars and fifty cents ($9.50) per one hundred dollars ($100) per year when the contract is

repayable within forty-eight (48) months from the date of making. . . . Such interest or discount shall be computed at the time the loan is made on the face amount of the contract for the full term of the contract from the date of the contract to the date of the scheduled maturity notwithstanding any requirement for installment payments.

124.     The Illegal Online Payday Loans made to Plaintiff Achey in Pennsylvania were made by Illegal Online Payday Lenders who have not been licensed by the Secretary of Banking to make short-term loans.

125.     As set forth more fully above and incorporated by reference herein, the Illegal Online Payday Loans made to Plaintiff Achey in Pennsylvania featured interest or fees in excess of $9.50 per $100 loaned.  7 Pa. Stat. § 6213.

126.     BMO aided and abetted the Illegal Online Payday Lenders' violations of the Pennsylvania Consumer Credit Statute by providing the necessary access to the ACH Network to carry out the Illegal Online Payday Lenders' illegal scheme.

127.     In providing the necessary access to the ACH Network to carry out the Illegal Online Payday Lenders' illegal scheme, Defendant knowingly provided substantial assistance to—and profited from—the illegal lending activities of the Illegal Online Payday Lenders.

128.     At the time BMO provided the necessary access to the ACH Network to carry out the Illegal Online Payday Lenders' illegal scheme, it knew the identity of the Illegal Online Payday Lenders, including their unlawful activity.

129.     Defendant was prohibited by NACHA Rules from honoring ACH transactions initiated on unlawful payday loans.

130.     Defendant was aware of the illegal nature of the lending activities of the Illegal Online Payday Lenders through due diligence procedures.

131.    As a result of BMO's knowing participation in the making of illegal payday loans, it is liable as an aider and abettor to the violations of the Pennsylvania Consumer Credit Statute referenced herein.

### SIXTH CLAIM FOR RELIEF
### Unjust Enrichment against Defendant
### (On Behalf of the Sub-Class)

132.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

133.    Defendant BMO, in its role as ODFI, originated debit entries on the ACH Network initiated by Illegal Online Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that were in violation of state law, the NACHA Operating Rules, and FDIC and OCC guidelines.

134.    Defendant charged and retained a transaction fee for each debit entry it originated on the ACH Network at the request of Illegal Online Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that were in violation of state law, the NACHA Operating Rules, and FDIC and OCC guidelines.

135.    Defendant received and retained wrongful benefits from Plaintiff and the Sub-Class in the form of such transaction fees.

136.    As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Sub-Class.

137.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

138.    It is inequitable for Defendant BMO to be permitted to retain the benefits it received, and is still receiving, without justification, from initiating debit entries on the ACH Network originated by Illegal Online Payday Lenders (or Third-Party Senders acting on the Originator's behalf).    Defendant's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

139.    The financial benefits derived by Defendant rightfully belong to Plaintiff and members of the Sub-Class.  Defendant BMO should be compelled to disgorge in a common fund for the benefit of Plaintiff and members of the Sub-Class all wrongful or inequitable proceeds received from them.  A constructive trust should be imposed upon all wrongful or inequitable sums received by Defendant traceable to Plaintiff and the members of the Sub-Class.

140.    Plaintiff and members of the Sub-Class have no adequate remedy at law.

### SEVENTH CAUSE OF ACTION
### Permanent Injunctive Relief
### (On behalf of the Class and Sub-Class)

141.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

142.    Defendant BMO should be enjoined and prohibited from serving as the ODFI for Out-Of State Payday Lenders and directed to immediately credit to all Illegal Online Payday Lender borrowers, any money it has debited from borrowers' accounts but has not yet remitted to Illegal Online Payday Lenders.

**WHEREFORE**, Plaintiff on his behalf and on behalf of the Class seeks judgment in an amount to be determined at trial but not less than $5,000,000, as follows:

(a)        Under 18 U.S.C. § 1964(c), awarding each member of Class and Sub-Class

damages from BMO for BMO's violations of 18 U.S.C. § 1962(c) consisting

of a refund of every ACH debit from their account in which BMO was the ODFI and which represented: (a) any payment of interest to an Illegal Online Payday Lender, trebled (AZ, AK, GA, NJ, NC, OH, VT, WV, DC); (b) any payment in excess of the Class members' states' maximum rate to an Illegal Online Payday Lender, trebled (MD, PA); or (c) any payment of any kind to an Illegal Online Payday Lender, trebled (CT, MA, NY);

(b)     Under 18 U.S.C. § 1964(c), awarding each member of the Class and Sub-Class damages from BMO for BMO's violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit from their account in which BMO was the ODFI and which represented: (a) any payment of interest to an Illegal Online Payday Lender, trebled (AZ, AK, GA, NJ, NC, OH, VT, WV, DC); (b) any payment in excess of the Class members' states' maximum rate to an Illegal Online Payday Lender, trebled (MD, PA); or (c) any payment of any kind to an Illegal Online Payday Lender, trebled (CT, MA, NY);

(c)     Permitting each member of the Sub-Class to recover damages in assumpsit from BMO consisting of a refund of every ACH debit from their account in which BMO was the ODFI and which represented payment of interest at a rate greater than 6% per annum on a loan from an Illegal Online Payday Lender;

(d)     Compelling BMO to disgorge in a common fund for the benefit of Plaintiff and the Class all wrongful or inequitable proceeds received from them. A constructive trust should be established.

(e)     Awarding the Sub-Class damages against BMO as an aider and abettor to the violations of the Pennsylvania Maximum Interest Rates Statute;

(f)     Awarding the Sub-Class damages against BMO as an aider and abettor to the violations of the Pennsylvania Consumer Credit Statute;

(g)     Granting a permanent injunction enjoining and prohibiting BMO from serving as the ODFI for Illegal Online Payday Lenders and directing Defendant to immediately credit to all Illegal Online Payday Lenders' borrowers, any money it has debited from borrowers' accounts but have not yet remitted to Illegal Online Payday Lenders;

(h)     Awarding Plaintiff's attorneys' fees and costs in pursuing this action; and

(i)     Awarding such other and further relief as this Court deems just, proper and equitable.

## JURY DEMAND

Plaintiff hereby demands a jury trial in the instant action.


Dated:  October 25, 2013

                              Respectfully submitted,

                              /s/ Jeffrey M. Ostrow
                              Jeffrey M. Ostrow
                              ostrow@kolawyers.com
                              Jason H. Alperstein
                              alperstein@kolawyers.com
                              **KOPELOWITZ OSTROW P.A.**
                              200 S.W. 1st Avenue, 12th Floor
                              Fort Lauderdale, Florida 33301
                              Tel:    (954) 525-4100
                              Fax:    (954) 525-4300

**CHITWOOD HARLEY HARNES LLP**
Darren T. Kaplan, *pro hac vice forthcoming*
1350 Broadway, Suite 908
New York, NY 10018
Tel: (917) 595-3600
Fax: (404) 876-4476
dkaplan@chitwoodlaw.com

**STUEVE SIEGEL HANSON LLP**
Norman E. Siegel, *pro hac vice forthcoming*
Steve Six, *pro hac vice forthcoming*
J. Austin Moore, *pro hac vice forthcoming*
460 Nichols Road, Suite 200
Kansas City, MO 64112
Tel:      (816) 714-7100
Fax:      (816) 714-7101
siegel@stuevesiegel.com
six@stuevesiegel.com
moore@stuevesiegel.com

**TYCKO & ZAVAREEI LLP**
Hassan A. Zavareei, *pro hac vice forthcoming*
Jeffrey D. Kaliel, *pro hac vice forthcoming*
Anna C. Haac, *pro hac vice forthcoming*
2000 L Street, N.W.
Suite 808
Washington, D.C. 20036
Tel:      (202) 973-0900
Fax:      (202) 973-0950
hzavareei@tzlegal.com
jkaliel@tzlegal.com
ahaac@tzlegal.com

*Counsel for Plaintiff and the Class*

JS 44 (Rev. 3/13)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

CHRISTINA ACHEY, on behalf of herself and all others similarly situated,

**(b)** County of Residence of First Listed Plaintiff    Lehigh, PA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Jeffrey M. Ostrow, Kopelowitz Ostrow P.A., 200 SW 1st Ave., Ste. 1200, Ft. Lauderdale, FL 33301 (954)525-4100

## DEFENDANTS

BMO HARRIS BANK, N.A.

County of Residence of First Listed Defendant    Cook, IL
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| 1 | U.S. Government Plaintiff | ✓ 3 | Federal Question *(U.S. Government Not a Party)* |
| 2 | U.S. Government Defendant | 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*   *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated or Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❑ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❑ 625 Drug Related Seizure of Property 21 USC 881 | ❑ 422 Appeal 28 USC 158 | ❑ 375 False Claims Act |
| ❑ 120 Marine | ❑ 310 Airplane | ❑ 365 Personal Injury - | ❑ 690 Other | ❑ 423 Withdrawal | ❑ 400 State Reapportionment |
| ❑ 130 Miller Act | ❑ 315 Airplane Product |    Product Liability | |    28 USC 157 | ❑ 410 Antitrust |
| ❑ 140 Negotiable Instrument |    Liability | ❑ 367 Health Care/ | | | ❑ 430 Banks and Banking |
| ❑ 150 Recovery of Overpayment | ❑ 320 Assault, Libel & |    Pharmaceutical | | **PROPERTY RIGHTS** | ❑ 450 Commerce |
|    & Enforcement of Judgment |    Slander |    Personal Injury | | ❑ 820 Copyrights | ❑ 460 Deportation |
| ❑ 151 Medicare Act | ❑ 330 Federal Employers' |    Product Liability | | ❑ 830 Patent | ◼ 470 Racketeer Influenced and |
| ❑ 152 Recovery of Defaulted |    Liability | ❑ 368 Asbestos Personal | | ❑ 840 Trademark |    Corrupt Organizations |
|    Student Loans | ❑ 340 Marine |    Injury Product | | | ❑ 480 Consumer Credit |
|    (Excludes Veterans) | ❑ 345 Marine Product |    Liability | | **LABOR** | **SOCIAL SECURITY** | ❑ 490 Cable/Sat TV |
| ❑ 153 Recovery of |    Liability | **PERSONAL PROPERTY** | ❑ 710 Fair Labor Standards | ❑ 861 HIA (1395ff) | ❑ 850 Securities/Commodities/ |
|    Veteran's Benefits | ❑ 350 Motor Vehicle | ❑ 370 Other Fraud |    Act | ❑ 862 Black Lung (923) |    Exchange |
| ❑ 160 Stockholders' Suits | ❑ 355 Motor Vehicle | ❑ 371 Truth in Lending | ❑ 720 Labor/Management | ❑ 863 DIWC/DIWW (405(g)) | ❑ 890 Other Statutory Actions |
| ❑ 190 Other Contract |    Product Liability | ❑ 380 Other Personal |    Relations | ❑ 864 SSID Title XVI | ❑ 891 Agricultural Acts |
| ❑ 195 Contract Product Liability | ❑ 360 Other Personal |    Property Damage | ❑ 740 Railway Labor Act | ❑ 865 RSI (405(g)) | ❑ 893 Environmental Matters |
| ❑ 196 Franchise |    Injury | ❑ 385 Property Damage | ❑ 751 Family and Medical | | ❑ 895 Freedom of Information |
| | ❑ 362 Personal Injury - |    Product Liability |    Leave Act | |    Act |
| |    Medical Malpractice | | ❑ 790 Other Labor Litigation | | ❑ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❑ 791 Employee Retirement | **FEDERAL TAX SUITS** | ❑ 899 Administrative Procedure |
| ❑ 210 Land Condemnation | ❑ 440 Other Civil Rights | **Habeas Corpus:** |    Income Security Act | ❑ 870 Taxes (U.S. Plaintiff |    Act/Review or Appeal of |
| ❑ 220 Foreclosure | ❑ 441 Voting | ❑ 510 Motions to Vacate | |    or Defendant) |    Agency Decision |
| ❑ 230 Rent Lease & Ejectment | ❑ 442 Employment |    Sentence | | ❑ 871 IRS—Third Party | ❑ 950 Constitutionality of |
| ❑ 240 Torts to Land | ❑ 443 Housing/ | ❑ 530 General | |    26 USC 7609 |    State Statutes |
| ❑ 245 Tort Product Liability |    Accommodations | ❑ 535 Death Penalty | | | |
| ❑ 290 All Other Real Property | ❑ 445 Amer. w/Disabilities | ❑ 540 Mandamus & Other | **IMMIGRATION** | | |
| |    Employment | ❑ 550 Civil Rights | ❑ 462 Naturalization Application | | |
| | ❑ 446 Amer. w/Disabilities | ❑ 555 Prison Condition | ❑ 463 Habeas Corpus - | | |
| |    Other | ❑ 560 Civil Detainee - |    Alien Detainee | | |
| | ❑ 448 Education |    Conditions of |    (Prisoner Petition) | | |
| | |    Confinement | ❑ 465 Other Immigration | | |
| | | |    Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☑ 1 Original Proceeding    ❑ 2 Removed from State Court    ❑ 3 Remanded from Appellate Court    ❑ 4 Reinstated or Reopened    ❑ 5 Transferred from Another District *(specify)*    ❑ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)

18 U.S.C. 1962(c) and (d)

## VII. Previous Bankruptcy Matters (For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary.)

## VIII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☑ Yes   ❑ No

## IX. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

## X. This case (check one box) ❑ Is not a refiling of a previously dismissed action    ❑ is a refiling of case number _____ previously dismissed by Judge _____

DATE    10-25-13

SIGNATURE OF ATTORNEY OF RECORD

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.**      **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

     (b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

     (c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**      **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)

**III.**      **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**      **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**      **Origin.** Place an "X" in one of the six boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

**VI.**      **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. Do not cite jurisdictional statutes unless diversity. Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**      **Previous Bankruptcy Matters** For nature of suit 422 and 423 enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this court. Use a separate attachment if necessary.

**VIII.**      **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P. Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**IX.**      **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**X.**      **Refiling Information.** Place an "X" in one of the two boxes indicating if the case is or is not a refiling of a previously dismissed action. If it is a refiling of a previously dismissed action, insert the case number and judge.

     **Date and Attorney Signature.** Date and sign the civil cover sheet.

Rev040913