# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CHRISTINA ACHEY, on Behalf of Herself and All Others Similarly Situated, | ) ) ) | Case No. 13-cv-7675 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Judge Harry D. Leinenweber |
| v. | ) | |
| | ) | |
| BMO HARRIS BANK, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT BMO HARRIS BANK, N.A.'S
<u>MOTION TO COMPEL ARBITRATION</u>**

# TABLE OF CONTENTS

Table of Contents .................................................................................................... i

Table of Cases .......................................................................................................... ii

INTRODUCTION ....................................................................................................1

BACKGROUND .......................................................................................................2

ARGUMENT ............................................................................................................5

I.    The Loan Agreements Are Not Properly Authenticated And Are Therefore
      Inadmissible Hearsay .....................................................................................5

II.   The Liberal Scope Of The FAA Has No Applicability To Non-Party BMO ....................6

III.  Plaintiff Is Not Estopped From Denying Arbitration ...........................................7

      A.    BMO Has Not Established Equitable Estoppel Is Available Under The
            Law Governing The Loan Agreements................................................................7

      B.    Even If This Court Considers The Issue Under Third Circuit Law,
            BMO Cannot Use The Principles Of Equitable Estoppel To Compel
            Arbitration Against Plaintiff. ...............................................................................8

            1.    Plaintiff's Claims Are Not "Intertwined" With The Loan Agreements. .....9

            2.    BMO's Relationship With MNE Does Not Justify Estoppel: BMO
                  Has No Obligations And Duties Under The Loan Agreements................13

      C.    BMO's Unclean Hands Bars It From Utilizing Equitable Doctrines
            To Enforce Clauses Contained In The Loan Agreements .....................................16

IV.   BMO Cannot Enforce The Arbitration Provision As A Third-Party Beneficiary Of
      The Loan Agreements........................................................................................17

CONCLUSION.........................................................................................................20

## TABLE OF CASES

*Amato v. KPMG LLP*,
    433 F. Supp. 2d 460 (M.D. Pa. 2006) ...................................................................16, 17

*Arthur Andersen LLP v. Carlisle*,
    556 U.S. 624 (2009).........................................................................................7, 8

*Bailey v. ERG Enterprises, LP*,
    705 F.3d 1311 (11th Cir. 2013) .............................................................................12

*Bannett v. Hankin*,
    331 F.Supp.2d 354 (E.D. Pa. 2004) .......................................................................11

*Basile v. H & R Block Inc.*,
    563 Pa. 359, 761 A.2d 1115 (Pa. 2000) ...................................................................20

*Brantley v. Republic Mortgage Ins. Co.*,
    424 F.3d 392 (4th Cir. 2005) ...............................................................................12

*CGB Occupational Therapy, Inc. v. RHA Health Serv., Inc.*,
    357 F.3d 375 (3d Cir. 2004)..................................................................................20

*Datamatic Servs., Inc. v. United States*,
    909 F.2d 1029, 1033 (7th Cir. 1990) .......................................................................6

*Denney v. BDO Seidman, L.L.P.*,
    412 F.3d 58 (2d Cir. 2005).............................................................................14, 15

*Denney v. Jenkens & Gilchrist*,
    412 F.Supp.2d 293 (S.D.N.Y. 2005).......................................................................15

*Developers Sur. & Indem. Co. v. Mathias*,
    No. 12-CV-2216, 2013 WL 6504751 (M.D. Pa. Dec. 11, 2013)................................17

*Devon Robotics v. DeViedma*,
    No. 09-CV-3552, 2012 WL 3627419 (E.D. Pa. Aug. 23, 2012) ...................................7

*Dillon v. BMO Harris Bank, N.A., et al.*,
    No. 13-cv-00897-CCE-LPA (M.D.N.C. Mar. 11, 2014).............................................5

*E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*,
    269 F.3d 187 (3d Cir. 2001)..............................................................................9, 13

*Friedman v. Yula*,
    679 F. Supp. 2d 617 (E.D.Pa. 2010) .......................................................................13

*Gaudiosi v. Mellon*,
  269 F.2d 873 (3d Cir. 1959)..................................................................16

*Hawkins v. KPMG LLP*,
  423 F. Supp. 2d 1038 (N.D. Cal. 2006) ................................................17

*Holden v. Deloitte & Touche LLP*,
  390 F. Supp. 2d 752, 765 (N.D. Ill. 2005) ...........................................15

*In re Humana Inc. Managed Care Litig.*,
  285 F.3d 971 (11th Cir. 2002) ..........................................10, 13, 14, 15

*In re Wholesale Grocery Products Antitrust Litigation*,
  707 F.3d 917 (8th Cir. 2013) ................................................................15

*Keystone Driller Co. v. General Excavator Co.*,
  290 U.S. 240 (1933).............................................................................17

*Kramer v. Toyota Motor Corp.*,
  705 F.3d 1122 (9th Cir. 2013) .............................................................12

*Leighton v. Chesapeake Appalachia, LLC*,
  No. 13-CV-2018, 2013 WL 6191739 (M.D. Pa. Nov. 26, 2013) .................11

*MacDonald v. Unisys Corp.*,
  No. 12-1705, 2013 WL 2626929 (E.D. Pa. June 12, 2013) ..........................8

*Miron v. BDO Seidman, LLP*,
  342 F. Supp. 2d 324 (E.D. Pa. 2004) ....................................10, 11, 13, 15

*MS Dealer Corp. v. Franklin*,
  177 F.3d 942 (11th Cir. 1999) .........................................................14, 15

*Murphy v. DirecTV, Inc.*,
  724 F.3d 1218 (9th Cir. 2013) .........................................................9, 12, 15

*Mylan, Inc. v. Zorich*,
  No. 12-CV-80, 2012 WL 527662 (W.D. Pa. Feb. 16, 2012) .....................19

*Republic of Iraq v. BNP Paribas USA*,
  472 Fed. Appx. 11 (2d Cir. 2012).....................................................19, 20

*Sarl v. A.M. Todd. Co.*,
  No. 07-27272008 WL 724607 (E.D. Pa. Mar. 18, 2008) ..................12, 13

iii

*Sovereign Bank v. BJ's Wholesale Club, Inc.*,
533 F.3d 162 (3d Cir. 2008)...................................................................................................19

*Todd v. Steamship Mut. Underwriting Ass'n (Bermuda)*,
601 F.3d 329 (5th Cir. 2010) ...................................................................................................8

*Two Rivers Terminal, L.P. v. Chevron USA, Inc.*,
96 F. Supp. 2d 432 (M.D. Pa. 2000) ......................................................................................18

*United Steelworkers v. Warrior & Gulf Navigation Co.*,
363 U.S. 574 (1960).................................................................................................................7

## INTRODUCTION

Defendant BMO Harris Bank, N.A. ("BMO") seeks to enforce an arbitration provision contained in two payday loan agreements—to which it is not a party— (the "Loan Agreements") between Plaintiff Christina Achey ("Plaintiff" or "Achey") and MNE Services, Inc. d/b/a AmeriLoan ("MNE Services").[1] BMO is seeking to enforce agreements that would eliminate the rights of Plaintiff, a Pennsylvania resident, to pursue her claims before this Court based on an agreement in which BMO was never contemplated as a party and whose express terms violate Pennsylvania usury laws. (*See*, Doc. 30-5, pp. 35, 47) (disclosed annual interest rates of 782.14% and 476.09%)).[2]

To compel repayment of their unlawful loans, Illegal Payday Lenders (the "Illegal Payday Lenders") such as MNE Services need access to borrowers' bank accounts so that they can directly debit payments, fees, and penalties. BMO is one of the very small number of financial institutions that entered into agreements with Illegal Payday Lenders to debit borrowers' accounts as Originating Depository Financial Institutions ("ODFI(s)") in the ACH Network. In exchange, BMO receives a transactional fee for each debit it originates. (*See* Doc. 1, ¶¶ 79, 134.)

In its recitation of the facts, BMO gives a general description of the ACH Network, but fails to describe the reality of its relationship with MNE Services. BMO claims that on the ACH Network the merchant transmits a credit or debit authorization to an ODFI, "which is any bank that is a member of the ACH network (such as BMO Harris)." (Doc. 29, p. 10.) But BMO is not a randomly-selected ODFI that happened to initiate debits on behalf of MNE Services. To the

---

[1] Plaintiff's Complaint refers to the payday lender at issue as AmeriLoan. *See* Doc. 1, ¶ 13. We use "MNE Services" here for consistency with Defendant's identification of the payday lender

[2] Plaintiff's citations to the record refer to the file-stamped page numbers in the top right corner of the ECF-filed documents rather than those in the bottom center margin.

contrary, BMO knowingly contracted with Illegal Payday Lenders, including MNE Services, to originate ACH transactions on their behalf. (Doc. 1, ¶ 9.) This is not a "traditional" banking function like holding deposited funds; BMO *chose* to participate as an ODFI in the ACH Network and *chose* to originate entries on behalf of high-risk merchants like Illegal Payday Lenders—in the face of NACHA Rules and regulatory guidelines warning against it—to turn extra profit. Doubling down on its prohibited conduct, BMO now seeks to enforce the actual illegal Loan Agreements with Plaintiff to avoid liability for its actions. This attempt must fail.

BMO's argument that the Federal Arbitration Act ("FAA") mandates arbitration here is beside the point because the FAA does not come into play unless BMO shows it is entitled to enforce the Loan Agreements as a non-party under traditional state law principles, which it cannot do. BMO argues it should be able to compel arbitration as a third-party beneficiary of the Loan Agreements or under principles of equitable estoppel. But BMO has not met its burden of showing that both of the signatories to the Loan Agreements intended to create third-party beneficiary rights for BMO . Likewise, BMO cannot enforce the Loan Agreements under equitable estoppel because Plaintiff does not rely on the duties and obligations set forth in the Loan Agreements to assert her statutory and state law claims, and because BMO has unclean hands. For the reasons set forth below, BMO's motion must be rejected.

## **BACKGROUND**

The ACH Network consists of an accountholder (called a "Receiver") who authorizes a transaction with a merchant, like the payday lenders here, pursuant to a written contract reflecting authorization to initiate ACH transactions. (Doc. 1, ¶ 32.) To "initiate"  credit and debit entries into the ACH Network, the merchant payday lender must find an ODFI bank willing to takes its business and then enter into a written "Origination Agreement" with that ODFI bank,

like defendant BMO did here. The Origination Agreement must, pursuant to NACHA Rules,[3] define the parameters of the relationship between the two parties and ensure that the entries comply with state and federal law and NACHA rules. (*Id.* ¶¶ 34, 37, 47, 93.)[4] If the ODFI bank decides that all is in order with the merchant's request to initiate the entry, the ODFI bank "originates" the entry into the ACH Network. ODFIs like BMO *choose* to join the ACH Network, *choose* to serve as the "gatekeepers" guarding access to the ACH Network and verifying the authenticity, legality, and validity of the entries it "originates" on behalf of particular merchants, and *choose* to be collectively governed by the rules and regulations promulgated by NACHA.

NACHA refers to ODFIs in particular as "***the gatekeepers of the ACH Network***" and holds them responsible for all entries they originate on behalf of the merchants. (*Id.* ¶¶ 37-49.) The NACHA Rules places the burden on ODFI banks to perform due diligence and monitoring for unlawful transactions and to kick out of the network unlawful merchants who are not in compliance with the NACHA rules or state and federal law. (*Id.* ¶ 34.) Indeed, it is the ODFI banks' "gatekeeper" obligations that are intended to keep illicit and unlawful transactions, like those alleged in the Complaint, out of the ACH Network. (*Id.* ¶¶ 34-35.) The Office of the Comptroller of the Currency ("OCC") and the Federal Deposit Insurance Corporation ("FDIC") have also offered substantial guidance to ODFIs regarding the "significant risks" involved for banks in originating transactions for high-risk merchants like online payday lenders such as MNE. (*Id.* ¶¶ 50-64.)

---

[3] NACHA manages the development, administration, and governance of the ACH Network and is funded by the financial institutions it governs. The substantial and thorough rules and regulations that govern the ACH Network, established by NACHA and the Federal Reserve, are known as the "NACHA Operating Rules." (Doc. 1, ¶ 31.)

[4] Plaintiff has requested the "Origination Agreement" between the payday lenders and BMO Harris which BMO has consistently refused to provide. Because Origination Agreements routinely (and are required under NACHA) to define the bounds of the relationship between the ODFI and merchant—and these agreements routinely expressly disclaim an agency or similar type of relationship between the parties—the Origination Agreements between BMO and its payday lenders are extremely relevant to this motion.

On or about October 11, 2012 and July 10, 2013, Plaintiff applied for and received payday loans in the amounts of $200 and $350 respectively from MNE Services by completing an application on the www.AmeriLoan.com website. As part of the application process, Plaintiff authorized MNE Services to debit her checking account with People First Federal Credit Union in order to repay the loan. (Doc. 1, ¶¶ 70, 74.) By their terms, the Loan Agreements provide for finance charges of $60 on a $200 loan and $105 on a $350 loan—an astounding ***782.14% and 476.09% annual interest rate***. (Doc. 30-5, pp. 35, 57.)

On or about September 13, 2013, MNE Services (or a Third-Party Sender acting on its behalf) initiated a debit transaction of $105 to its ODFI bank BMO requesting that BMO "originate" a debit from Plaintiff's checking account in Pennsylvania through the ACH Network. BMO originated the transaction. (Doc. 1, ¶ 78.) By originating these types of transactions, BMO knowingly provides ACH Network access to Illegal Payday Lenders like MNE Services in violation of NACHA Rules and state laws and in disregard of the warnings and guidance issued to banks by the OCC and FDIC. Without ODFI banks like BMO agreeing to "originate" the credit and debit entries initiated to it by unscrupulous merchants, Illegal Payday Lenders like MNE Services could not use the ACH Network to debit loan payments from customers' bank accounts in states where the loans are illegal. (Doc. 1, ¶¶ 6-7.) BMO has knowingly provided substantial assistance to—and profited from—the illegal lending activities of Illegal Payday Lenders and here should be held responsible for that behavior. (Doc. 1, ¶ 9.)

BMO now attempts to avoid liability for its own, independent wrongdoing by asking the Court to enforce an arbitration provision contained in illegal Loan Agreements to which it is not a party while at the same time refusing to provide the Origination Agreement between itself and the illegal lender—the very contract that permits BMO to "originate" the entries the lender

4

"initiates" to BMO and which defines the bounds of their relationship. For the reasons set forth below, BMO's attempt to use another party's arbitration agreement to deny Plaintiff access to this Court must be denied.

## ARGUMENT

I. **The Loan Agreements Are Not Properly Authenticated And Are Therefore Inadmissible Hearsay.**

To the extent that BMO relies on the Declaration of Natalie C. Dempsey ("Dempsey Declaration") (Doc. 30-5, pp. 5-55) and the exhibits thereto, the Dempsey Declaration fails to provide an evidentiary foundation for many of the statements therein and for the exhibits annexed. In a very recent ruling, the United States District Court for the Middle District of North Carolina found that a loan agreement offered by BMO in a similar case had not been properly authenticated—and on that basis denied BMO's Motion to Compel Arbitration. *See Dillon v. BMO Harris Bank, N.A., et al.*, No. 13-cv-00897-CCE-LPA (M.D.N.C. Mar. 11, 2014), attached hereto as Exhibit A.

Here, the application documents and Loan Agreements attached to the Dempsey Declaration have not been properly authenticated. Federal Rule of Evidence 901(a) requires "authentication or identification as a condition precedent to admissibility." Thus, before evidence may be admitted, a foundation must be laid "by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). Although Dempsey works for AMG Services, Inc. ("AMG"), which is purportedly "a shared service provider" for MNE Services, no explanation is given for the meaning of this term. (*See*, Dempsey Declaration at ¶ 2.) Moreover, it is not explained how a "shared service provider" would come into contact with these documents. The Dempsey Declaration, bereft of any evidence that the loan documents are authentic, fails the Rule 901(a) test.

Ignoring Rule 901(a)'s general requirements for admissibility, BMO attempts to admit the ***unsigned*** loan documents as supposed business records under the hearsay exception of Fed. R. Evid. 803(6). That rule has three elements: 1) the document must be prepared in the normal course of business; 2) it must be made at or near the time of the events it records; and 3) it must be based on the personal knowledge of the entrant or on the personal knowledge of an informant having a business duty to transmit the information to the entrant. *See generally McCormick on Evidence*, § 306 et seq. (3d ed. 1984). Dempsey's Declaration does not meet a single one of the three 803(6) elements, and states only that, "[i]n connection with AMG's provision of services to MNE Services, AMG keeps, in its ordinary course of business, records of customer loan agreements. I am familiar with those records in the course of my work for AMG." (*Id.* at ¶ 17.) This statement is insufficient to qualify the loan documents as "business records" under Fed. R. Evid. 803(6). In any event, because Dempsey is not an employee of MNE Services, she cannot testify as to the accuracy of the information contained in MNE Service's documents even if they are now within the custody of AMG. "[I]f the source of the information is an outsider, Rule 803(6) does not, by itself, permit the admission of the business record. The outsider's statement must fall within another hearsay exception." *Datamatic Servs., Inc. v. United States*, 909 F.2d 1029, 1033 (7th Cir. 1990) (citations omitted).[5]

## II.     The Liberal Scope Of The FAA Has No Applicability To Non-Party BMO.

Assuming that this Court will consider the hearsay Loan Agreements, BMO spends a considerable portion of its brief reciting their broad "disputes" provisions and the liberal

---

[5] Moreover, the Dempsey Declaration here does not set forth the basis for Dempsey's personal knowledge of the relevant website. Asserting her employment with AMG since 2009 and her current title of "project manager," Dempsey states that AMG "operates as a shared service provider for MNE." Dempsey Decl. ¶ 2. No information is provided as to the responsibilities and knowledge base of a project manager for AMG. The declaration does not establish Dempsey' personal knowledge of how the AmeriLoan website is run. Therefore, judicial notice of the website pages marked as exhibits one through four is not warranted because the factors set forth in Fed. R. Evid. 201(b) are not present for these documents.

arbitration policy of the FAA, which BMO contends apply. (*See* Doc. 29, pp. 11-13.) But because BMO did not sign the Loan Agreements and is not a "party" under the express terms of the agreements, the scopes of the disputes provisions and liberal policy of the FAA have no bearing on BMO until it *first establishes* it has the right to enforce the agreements under traditional principles of state law.[6] *See, e.g., Rajagopalan v. NoteWorld, LLC*, 718 F.3d 844, 847 (9th Cir. 2013) (where the question is "not whether a particular issue is arbitrable, but whether a particular *party* is bound by the arbitration agreement . . . the liberal federal policy regarding the scope of arbitrable issues is inapposite.") (quotations omitted and emphasis in original); *Devon Robotics v. DeViedma*, No. 09-CV-3552, 2012 WL 3627419, at *9 (E.D. Pa. Aug. 23, 2012) ("The presumption of arbitrability has never been extended to claims by or against non-signatories"). As a result, the FAA and breadth of an arbitration clause have no bearing on BMO until it first establishes it has the right to enforce the agreement as a non-signatory. As discussed below, BMO cannot make such a showing.

### III.      Plaintiff Is Not Estopped From Denying Arbitration

#### A.      BMO Has Not Established Equitable Estoppel Is Available Under The Law Governing The Loan Agreements.

As a threshold matter, BMO cannot proceed under an equitable estoppel theory because it has not met its burden to establish that the law governing the Loan Agreements recognizes equitable estoppel as an exception to the general rule that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960).

A non-signatory to an arbitration agreement can only compel parties to arbitrate under the FAA when "the relevant state contract law allows him to enforce the agreement." *Arthur*

---

[6] The "[t]raditional principles of state law" determine whether a "contract [may] be enforced by or against nonparties to the contract." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009).

*Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009). *See also MacDonald v. Unisys Corp*., No. 12–1705, 2013 WL 2626929, at *6 (E.D. Pa. June 12, 2013) ("[p]ost-*Arthur Andersen* it is incontrovertible that state law governs the equitable estoppel and third-party beneficiary determinations."). As such, when an agreement contains a choice-of-law provision, the Court must apply that law to determine whether it "recognizes enforcement against a nonparty to the contract under traditional contract doctrines of 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver [or] estoppel.'" *Arthur Andersen*, 556 U.S. at 631 (citations omitted). *See, e.g., Todd v. Steamship Mut. Underwriting Ass'n (Bermuda)*, 601 F.3d 329, 336 (5th Cir. 2010) (remanding for district court to "address the effect of the clause in the [agreement] selecting English law to govern" equitable estoppel analysis in light of *Arthur Andersen*).

　　Throughout its brief, BMO invokes and attempts to enforce the language of the Loan Agreements when it benefits BMO, but neglects to inform the Court that the Loan Agreements state they are to be governed by the laws of the Miami Tribe of Oklahoma. (Doc. 30-5, pp. 35, 49.) Indeed, BMO completely ignores the issue of whether the law of the Miami Tribe of Oklahoma permits it to invoke equitable estoppel as an exception to the general rule that only parties to an agreement can be compelled to arbitrate. To be clear, Plaintiff takes no position on the applicability of that law other than to note that BMO has not even attempted to meet its burden under *Arthur Andersen* to show the law governing the Loan Agreements permit equitable estoppel as a valid basis to enforce a contract as a non-party. Accordingly, the inquiry ends there.

**B.**　　**Even If This Court Considers The Issue Under Third Circuit Law, BMO Cannot Use Equitable Estoppel To Compel Arbitration Against Plaintiff.**

Even if this Court considers the issue under Pennsylvania and Third Circuit precedent, however, BMO cannot satisfy the equitable estoppel doctrine. Under Third Circuit precedent, a

non-signatory can only compel a signatory to arbitrate based on estoppel where there is a: (1) "close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non[-]signatory's obligations and duties in the contract;" *and* (2) "the claims [are] intimately founded in and intertwined with the underlying contract obligations." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 199-200 (3d Cir. 2001) (internal quotations omitted). Neither circumstance is present here.

### 1. Plaintiff's Claims Are Not "Intertwined" With The Loan Agreements.

BMO argues that equitable estoppel is appropriate because "each of [Plaintiff's] claims arises out of [the loan] agreement and relies upon its terms." (Doc. 29, p. 15). But non-signatory BMO's rationale for compelling arbitration against Plaintiff cannot satisfy the purpose of the doctrine for which it was created: to prevent a plaintiff from "on the one hand, seek[ing] to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny[ing] arbitration's applicability because the defendant is a non-signatory." *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1229 (9th Cir. 2013) (quotations omitted).

Here, Plaintiff seeks to impose no duties on BMO under the Loan Agreements because BMO *has no duties or obligations* under the Loan Agreements. Indeed, the essence of BMO's argument is that because the illegal payday loans *exist* via the Loan Agreements, or are the "but-for" cause of the events leading up to the suit, the claims are necessarily intertwined. (*See* Doc. 29, pp. 14-15). But authority from Pennsylvania federal courts illustrates that where the plaintiff's claims are not premised on the non-signatory's violations of its duties or obligations under the agreement containing the arbitration clause, simply having some "relation" to the subject matter of the underlying agreement is insufficient to invoke estoppel.

9

In *Miron v. BDO Seidman, LLP*, 342 F. Supp. 2d 324 (E.D. Pa. 2004), plaintiff investors filed suit against defendant tax consultants ("BDO Defendants") and securities brokers ("Deutsche Bank Defendants") for their involvement in a tax shelter investment scheme. Although the plaintiffs entered into a consulting agreement with the BDO Defendants containing an arbitration clause ("BDO Agreement"), they had no such agreement with the Deutsche Bank Defendants. The court considered whether plaintiffs' claims against the Deutsche Bank Defendants for violations of RICO, unjust enrichment, breach of contract, breach of fiduciary duty, unethical, excessive, and illegal fees, and civil conspiracy were "intertwined" with plaintiffs' consulting agreement with the BDO Defendants. *See id.* at 333.

The court adopted the Eleventh Circuit's reasoning in *In re Humana Inc. Managed Care Litig.*, 285 F.3d 971, 976 (11th Cir. 2002) which held that "equitable estoppel was inappropriate where plaintiffs brought a RICO suit against a non-signatory defendant, because the RICO claims were based on a statutory remedy apart from any available remedy for breach of the underlying contract." *Miron*, 342 F. Supp. 2d at 333 (citing *In re Humana*, 285 F.3d at 976). Specifically, the court noted that "[t]he plaintiff's *actual dependence* on the underlying contract in making out the claim against the non[-]signatory defendant is therefore always the *sine qua non* of an appropriate situation for applying equitable estoppel." *Id.* (emphasis in *Miron*).

Here, Plaintiff's claims for RICO and state-law violations are independent of the Loan Agreement as her allegations are not "tied to any obligations [BMO] had or benefits [it] may have received under the terms of the [Loan] Agreement[s]." *See id.* The *Miron* Court emphasized that the "essential question in situations such as these is whether [p]laintiffs would have an independent right to recover against the non-signatory [d]efendants even if the contract containing the arbitration clause were void." *Id.* at 333. Here, as in *Miron*, Plaintiff does not need

to rely on duties or obligations under the Loan Agreements to assert her causes of action against BMO—indeed; Plaintiff alleges the Loan Agreements *are void* (Doc. 1, ¶25) as well as *unenforceable*. (Doc. 1, ¶¶ 7; 9; 13(a)(i); 49; 94(a); 96(c); 100(a); 101(b)).

BMO ignores *Miron* and instead cites the factually-distinguishable *Bannett v. Hankin*, 331 F.Supp.2d 354 (E.D. Pa. 2004). In that case, an investor with a limited partnership interest in two real estate partnerships sued an individual who formed the partnerships, served as an officer of the general partner for each partnership, and also served as president for the property management company used by the partnership. *See id.* at 356-58. The court held that the management company and its president could invoke the doctrine of equitable estoppel, notwithstanding that they had not signed the partnership agreements, because "all of Plaintiff's claims make reference to or presume the existence of the partnership agreements and relate directly to those agreements, specifically Plaintiff's right to receive preferred distributions" under the partnership agreements. *Id*. at 360.

Unlike in this case, the plaintiff in *Bannett* could not assert his claims without relying on *duties and obligations* imposed by the partnership agreements. Courts interpreting *Bannett* have recognized this important distinction. *See, e.g., Leighton v. Chesapeake Appalachia*, LLC, No. 1:13–CV–2018, 2013 WL 6191739, at *9 (M.D. Pa. Nov. 26, 2013) ("Plaintiffs are not relying on the Lease to establish their claims against the non[-]signatory defendants . . . . Nowhere in their complaint do they allege that a provision of the Lease entitles them to relief against these defendants. Instead, their claims against these defendants are statutory and common-law ones, claims they can assert against the non[-]signatories independently of the Lease…Since Plaintiffs are not relying on the provisions of the Lease to make their claims against the non[-]signatory defendants, fairness does not dictate that they be estopped from litigating their claims against

them in court and requiring them to go to arbitration instead."). Similarly, fairness does not dictate Plaintiff be estopped from litigating her statutory and common-law claims against BMO.

BMO also cites the unreported case of *Sarl v. A.M. Todd. Co.*, No. 07-2727, 2008 WL 724607, at *9 (E.D. Pa. Mar. 18, 2008). But in that case, the court estopped the plaintiff from litigating because he sought to hold a parent company liable under several theories for actions relating to its subsidiary's *breach* of a sales contract containing an arbitration clause. For the same reasons discussed above, the case is inapposite. BMO is not a corporate parent of MNE Services (or vice versa) and no contract breach is at issue here.

Finally, recent decisions from other circuits have confirmed that even if Plaintiff's claims have "some relation" to the Loan Agreements, this is insufficient to find that the claims "rely on" the Loan Agreements' terms. *See, e.g., Bailey v. ERG Enterprises, LP*, 705 F.3d 1311, 1321-22 (11th Cir. 2013) ("A simple but-for relationship does not constitute the actual dependence on the underlying contract that equitable estoppel requires."); *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1130 (9th Cir. 2013) (expressly rejecting defendant's argument that the plaintiffs' claims were necessarily intertwined because they "rely on the existence of [p]laintiffs' vehicle purchase transactions"); *Murphy,* 724 F.3d at 1230 (holding that "[e]ven if Best Buy is correct that [p]laintiffs' claims on some abstract level require the existence of the Customer Agreement, the law is clear that this is not enough for equitable estoppel"). Similarly, in *Brantley v. Republic Mortgage Ins. Co.*, 424 F.3d 392 (4th Cir. 2005), a defendant insurer attempted to compel arbitration as a non-signatory to a mortgage loan agreement that required the insurance arguing that plaintiffs' claims were "intertwined" with that agreement. The Fourth Circuit disagreed:

> Although the mortgage insurance *relates* to the mortgage debt, the premiums of
> the mortgage insurance are separate and wholly independent from the mortgage
> agreement. The district court correctly found that the mere existence of a loan
> transaction requiring plaintiffs to obtain mortgage insurance cannot be the basis

12

for finding their federal statutory claims, which are wholly unrelated to the underlying mortgage agreement, to be intertwined with that contract.

*Id*. at 396 (emphasis added).

Here, Plaintiff is seeking to hold BMO liable for its *independent* actions as an ODFI in facilitating illegal payday loan transactions across the ACH Network. As in the cases discussed above, compelling arbitration would not further the purpose of the doctrine because Plaintiff does not rely on the duties and obligations set forth in the Loan Agreements to assert her statutory and state law claims against BMO.

### 2. BMO's Relationship With MNE Services Does Not Justify Estoppel: BMO Has No Obligations Or Duties Under The Loan Agreements.

Similarly, BMO's relationship with MNE Services is not sufficiently close to justify invoking the doctrine. To invoke estoppel, Third Circuit precedent requires not only a "close relationship" between the signatory and non-signatory defendants, but also an examination of "the relationship of the alleged wrongs to the non[-]signatory's obligations and duties in the contract." *E.I. DuPont*, 269 F.3d at 199-200. Non-signatory BMO cannot satisfy this prong because, as discussed above, it has no "obligations and duties" under the Loan Agreements at all.

Even if a close relationship alone was enough to invoke the doctrine, however, BMO's arguments in favor of estoppel are unavailing. Indeed, the basis for this theory exclusively "involves claims about parent companies who have not signed agreements containing arbitration clauses entered into by related entities." *Friedman v. Yula*, 679 F. Supp. 2d 617, 628 (E.D. Pa. 2010). *See also Sarl*, 2008 WL 724607, at *9 (discussed *supra*). BMO does not have or purport to have a similar type of corporate affiliation with MNE Services.

In *In re Humana*, 285 F.3d 971, relied on by the court in *Miron*, *supra*, 342 F. Supp. 2d at 333, the Eleventh Circuit recognized that: "[a] plaintiff's allegations of collusive behavior

between the signatory and non[-]signatory parties to the contract do not automatically compel a court to order arbitration of all of the plaintiff's claims against the non[-]signatory defendant; rather, such allegations . . . [must be] intimately founded in and intertwined with the obligations imposed by the [contract containing the arbitration clause]." *Id*. at 975. The *In re Humana* court distinguished its earlier holding in *MS Dealer Corp. v. Franklin*, 177 F.3d 942 (11th Cir.1999) to clarify that estoppel is not appropriate "simply because the [plaintiffs] allege a RICO conspiracy." *Id*. The court held that "the fact that the doctors' complaint alleges a RICO conspiracy provides no basis in equity for allowing a non[-]signatory HMO to avail itself of an arbitration agreement that a coconspirator signatory HMO happens to have with a plaintiff doctor." *Id*. at 976-77. The same is true here. Plaintiff does not allege that BMO conspired with MNE Services to create the Loan Agreements—to the contrary—Plaintiff alleges that BMO conspired with MNE Services to use its position as an ODFI to collect unlawful debts in violation of RICO. As such, "the purpose of the doctrine is to prevent a plaintiff from, in effect, trying to have his cake and eat it too;" cannot be satisfied in this case. *Id*. at 976 (internal quotations omitted).

BMO cites *Denney v. BDO Seidman, LLP*, 412 F.3d 58 (2d Cir. 2005) in support of its argument that Plaintiff's allegations of concerted misconduct are sufficient to justify application of equitable estoppel. (*See* Doc. 29, p. 16). In *Denney*, plaintiffs asserted RICO claims against an accounting firm ("BDO") and other defendants in connection with certain tax transactions. Plaintiffs entered into consulting agreements with BDO that included an arbitration provision. *Id* at 61-62. On appeal, the Second Circuit suggested that Deutsche Bank, which was a non-signatory to the consulting agreements, may have a sufficiently close relationship with BDO to compel arbitration because, by alleging concerted action, the plaintiffs were not permitted to

"escape the consequences of those allegations by arguing" that the non-signatory defendant lacked "the requisite close relationship" to compel arbitration. *Id.* at 70. But the *Denney* court never actually compelled arbitration in that case and instead remanded for the determination of whether equitable estoppel was appropriate. *See id.*, 412 F.3d at 70-71. Significantly, on remand the district court adopted the rationale of *Miron* and declined to invoke estoppel. *See Denney v. Jenkens & Gilchrist*, 412 F.Supp.2d 293 (S.D.N.Y. 2005) ("Although the Court of Appeals held that the tax advice provided by BDO fell well within the scope of the consulting agreements, this does not equate to a finding that those agreements were central to the conspiracy alleged here.").

Other courts to consider this issue have reached a similar conclusion. *See, e.g., Murphy*, 724 F.3d at 1232 (9th Cir. 2013) ("Mere allegations of collusion are insufficient to trigger equitable estoppel;" the allegations "must also establish that the plaintiff's claims against the non[-]signatory are intimately founded in and intertwined with the obligations imposed by the contract containing the arbitration clause."); *In re Wholesale Grocery Products Antitrust Litigation*, 707 F.3d 917, 923 (8th Cir. 2013) (equitable estoppel only where plaintiff's claims "arose directly from violations of the terms of a contract containing an arbitration clause.").

Citing *Holden v. Deloitte & Touche LLP*, 390 F. Supp. 2d 752, 765 (N.D. Ill. 2005), BMO argues that Plaintiff "cannot 'have it both ways' and advance claims alleging concerted misconduct [by non-signatories] with signator[ies] while simultaneously seeking to ignore an arbitration agreement that they have made with the signatory.'" (citation omitted).[7] (Doc. 29, at p. 16.) But that case only demonstrates why estoppel is not appropriate here. In *Holden*, plaintiffs alleged that signatory and non-signatory "schemed together to commit a federal racketeering

---

[7] The *Holden* equitable estoppel determination relies heavily on the now suspect holding in *MS Dealer* that estoppel is appropriate "simply because the [plaintiffs] allege a RICO conspiracy." *In re Humana* 285 F.3d 976-77. *See*, *Holden*, *supra*, 390 F.Supp.2d 765-68.

offense, with the [plaintiffs] specifically identifying as predicate offenses the preparation of financial statements that were attached to and were part of" the agreement containing the arbitration clause. *Id*. at 765. (emphasis added). Plaintiff places no similar reliance on the terms of Loan Agreements. Plaintiff need not even rely on the Loan Agreements to evidence the usurious interest rates because the effective interest rate is ***mathematically determinabl****e* without reference to the Loan Agreements—indeed, all of Plaintiffs' claims could be advanced ***even if the Loan Agreements falsely provided for an interest rate that was legal in the state of Pennsylvania***. For the foregoing reasons, Plaintiff's relationship with MNE Services does not justify estoppel and BMO cannot satisfy either prong of the equitable estoppel analysis.

## C. BMO's Unclean Hands Bars it from Utilizing Equitable Doctrines To Enforce Clauses Contained In The Loan Agreements.

Finally, even if BMO could satisfy both prongs of the equitable estoppel test discussed above, it is a fundamental principle of law that, "[o]ne who comes into equity must come with clean hands and keep those hands clean throughout the pendency of the litigation even to the time of ultimate disposition by an appellate court." *Gaudiosi v. Mellon*, 269 F.2d 873, 881 (3d Cir. 1959) (citations omitted). In applying the clean hands maxim, courts are primarily concerned with their own integrity and are given wide discretion in refusing equitable relief to the "unclean litigant." *Id.* at 881 n. 10 (citation omitted).

Here, the inequitable conduct is clear from the face of the Loan Agreements. BMO collected on debts that were illegal under the law of Pennsylvania and twelve other states and then sought to rely on those very same illegal contracts in order to compel arbitration. Courts have recognized this as a valid basis to refuse to compel arbitration under principles of equitable estoppel. *See, e.g., Amato v. KPMG, LLP*, 433 F.Supp.2d 460, 489 (M.D. Pa. 2006) (noting that the "lynchpin for equitable estoppel is equity and the point of applying it to compel arbitration is

to prevent a situation that would fly in the face of fairness" and refusing to permit non-signatory to compel arbitration where it lacked clean hands in transactions underlying the claims).[8]

At the very least, BMO's unconscionable actions here in both collecting on illegal debts and then attempting to enforce rights springing from illegal contract "has immediate and necessary relation to the equity that [BMO] seeks in respect of the matter in litigation." *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933). The doors of equity are therefore closed to BMO's use of equitable doctrines such as equitable estoppel to enforce clauses contained in the agreements for those very same illegal loans. *See Hawkins v. KPMG LLP*, 423 F. Supp. 2d 1038, 1052 (N.D. Cal. 2006) (doctrine of unclean hands precludes court from applying equitable estoppel to compel arbitration of claims against non-signatory based on fraudulent agreement).

### IV.    BMO Cannot Enforce The Arbitration Provisions As A Third-Party Beneficiary.

BMO argues that it is a third-party beneficiary of the Loan Agreements. However, BMO cannot show that both MNE and Plaintiff intended BMO to be a third-party beneficiary of the Loan Agreements' arbitration clause as would be required in order for BMO to compel Plaintiff to arbitrate the claims again BMO.

In Pennsylvania, for a third-party beneficiary to have a right of action under a contract, it must establish that it is an intended beneficiary under one of two tests. *Developers Sur. & Indem. Co. v. Mathias*, 1:12-CV-2216, 2013 WL 6504751, at *4 (M.D. Pa. Dec. 11, 2013). "First, a party may be an express third-party beneficiary if the parties to the contract explicitly state their desire to benefit the third party in the contract." *Id.* Second, "a party may be an implied third-party beneficiary" if it can show the following:

---

[8] Vacated in part on other grounds, *See Amato v. KPMG, LLP*, No. 06cv39, 2006 WL 2376245 (M.D. Pa. Aug. 14, 2006).

17

> (1) the recognition of the beneficiary's right [is] "appropriate to effectuate the intention of the parties," and (2) the performance … "satisfy[ies] an obligation of the promisee to pay money to the beneficiary" or "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."

*Id.* (quotations omitted). In determining whether both of these requirements for implied third-party beneficiary status are met, the court has discretion to decide "whether *all parties to the contract* intended to benefit the third party," which it does by "examin[ing] the express terms of the contract." *Id.* at *4-5; *Two Rivers Terminal, L.P. v. Chevron USA, Inc.*, 96 F. Supp. 2d 432, 450 (M.D. Pa. 2000) ("[T]he circumstances must be so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties.")

First, the express language of the Loan Agreements do not indicate an intent to benefit BMO, as neither BMO nor ODFIs generally are identified even implicitly in the Loan Agreement. BMO argues that the explicit terms of the arbitration provisions confirm its third-party beneficiary status—arguing that its "providing services with respect to the loans" (Doc. 29, p. 19) makes BMO one of the express "related third parties, such as the lender's 'agents.'" (*Id.*) But BMO does not actually claim to be the "servicer" of the loans (BMO's own declaration makes clear that AMG is the servicer of the loans (Dempsey Declaration Doc. 30-5, p. 5, ¶ 2)) and BMO is careful to clarify, as it must, that "BMO . . . is in fact is not the lender's agent . . ." (*Id.*)  Indeed, if any entity "providing services" were covered by the arbitration agreements, the breadth of those agreements would swallow all entities even vaguely related to the loan presumably even including the driver of a mail truck carrying a loan payment check.

Second, BMO also is not an implied beneficiary. BMO attempts to use the terms of the Loan Agreements—which authorize the payday lender to *initiate* transactions on the ACH Network—to show that Plaintiff intended for ODFIs such as BMO (which *originate* transactions on the ACH Network)  to benefit because use of the ACH Network "necessarily includes an

ODFI." (Doc. 29, p. 19). But even if, wholly implausibly, Plaintiff had a sophisticated knowledge of the workings of the ACH Network, the ACH provision of the Loan Agreements does not cover "origination" at all—which is the only role BMO had. Moreover, even if an unidentified ODFI like BMO plays a role in the ACH process; that does not somehow demonstrate that the contract was made for *BMO's* benefit.

Third, even if BMO could somehow show that MNE Services intended for it to be included as a beneficiary of the Loan Agreement, it cannot show that *Plaintiff* had the same intent. *See Mylan, Inc. v. Zorich*, 2:12-CV-80, 2012 WL 527662 (W.D. Pa. Feb. 16, 2012) ("[I]n order for one to achieve third party beneficiary status, that party must show that *both* parties to the contract so intended, and that such intent was within the parties' contemplation at the time the contract was formed.") (quotations omitted). BMO cites to the Complaint's allegation that "BMO [Harris] derived a benefit through the receipt of fees for its origination of debit entries on the ACH Network" (Doc. 1, ¶ 79), as some sort of admission that, "[b]y Achey's own account, then, she and her lender intended in the loan agreement to confer a benefit on BMO Harris by authorizing it to implement ACH transfers requested by the lender." (Doc. 29, p. 19). However, that BMO benefited at some point *after* the Loan Agreements were executed makes it, at most, an incidental beneficiary of the Loan Agreements, "and an incidental beneficiary has no right to enforce a contract, no matter how great a stake it might have in doing so." *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 171 (3d Cir. 2008). The Loan Agreements nowhere indicate that Plaintiff intended the arbitration provision to apply to BMO or even the general class of ODFIs, and it was not an objectively reasonable expectation of Plaintiff that the provision would inure to the benefit of BMO.[9]

---

[9] BMO certainly has not made such a showing by a ***preponderance of the evidence***. *See Republic of Iraq v. BNP Paribas USA*, 472 F. App'x 11, 14 ("Assuming *arguendo* that Iraq is a third-party beneficiary with a right to enforce

Instead, BMO offers the reaching argument that, notwithstanding that it is not MNE Service's agent, Plaintiff purportedly *alleged* that BMO was MNE Services' agent so therefore Plaintiff is "bound by her allegations" and must arbitrate her claims even if BMO insists that those allegations are false. (Doc. 29, p. 19.) However, in Pennsylvania, there are three elements necessary to establish an agency relationship: (1) manifestation by a principal that an agent shall act for the principal; (2) the agent's acceptance of the undertaking; and (3) the parties' understanding that the principal is to be in control of the undertaking. *CGB Occupational Therapy, Inc. v. RHA Health Serv., Inc.*, 357 F.3d 375, 385 n. 11 (3d Cir.2004) (quoting *Basile v. H & R Block Inc.*, 563 Pa. 359, 761 A.2d 1115, 1120 (Pa.2000)). Plaintiff does not allege MNE Services is in control of the undertaking. To the contrary, Plaintiff alleges that NACHA Rules barred BMO from allowing MNE to maintain control over its activities. As alleged in detail in the Complaint (*see* Doc. 1, ¶¶ 37-49), NACHA Rules require that an ODFI closely monitor Originators like MNE Services.[10] The duties BMO had under NACHA Rules—to act as an independent monitor for potentially unlawful or inappropriate activity—eliminate any possibility that MNE Services "controls" the activities of BMO. To the contrary, BMO was actually entrusted by the NACHA Network with supervising and monitoring MNE Services. That arrangement that vitiates any claim of "agency," and provides no basis upon which BMO can compel arbitration against Plaintiff here.

## CONCLUSION

For the foregoing reasons, BMO's arguments to compel arbitration should be rejected.

---

the United Nations contract with BNP Paribas, Iraq must nevertheless show by a preponderance of the evidence that the parties intended to provide Iraq with the right to invoke arbitration.").

[10] *See, e.g.* Doc. 1, ¶ 39 ("Under the NACHA Rules, '[a]n ODFI is responsible for all Entries originated through the ODFI whether by an Originator or through a Third-Party Sender ... [a]n ODFI is responsible for its Originators' and Third-Party Senders' compliance with these Rules.' NACHA 2012 Operating Rules, Section 2.1.").

Dated: March 14, 2014.

Respectfully submitted,

/s/ Jason H. Alperstein
Jeffrey M. Ostrow
ostrow@kolawyers.com
Jason H. Alperstein
alperstein@kolawyers.com
**KOPELOWITZ OSTROW P.A.**
200 S.W. 1st Avenue, 12th Floor
Fort Lauderdale, Florida 33301
Tel: (954) 525-4100
Fax: (954) 525-4300

**CHITWOOD HARLEY HARNES LLP**
Darren T. Kaplan *(admitted pro hac vice)*
1350 Broadway, Suite 908
New York, NY 10018
Tel: (917) 595-3600
Fax: (404) 876-4476
dkaplan@chitwoodlaw.com

**STUEVE SIEGEL HANSON LLP**
Norman E. Siegel *(admitted pro hac vice)*
460 Nichols Road, Suite 200
Kansas City, MO 64112
Tel: (816) 714-7100
Fax: (816) 714-7101
siegel@stuevesiegel.com

**TYCKO & ZAVAREEI LLP**
Hassan A. Zavareei *(admitted pro hac vice)*
2000 L Street, N.W.
Suite 808
Washington, D.C. 20036
Tel: (202) 973-0900
Fax: (202) 973-0950
hzavareei@tzlegal.com

*Counsel for Plaintiff and the Class*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 14th day of March, 2014, a true and correct copy of the foregoing document was served via the Court's CM/ECF system upon all counsel of record.

**KOPELOWITZ OSTROW P.A.**

By: */s/ Jason H. Alperstein*
  Jason H. Alperstein
  Fla. Bar No.: 064205
  alperstein@kolawyers.com
  200 S.W. 1st Avenue, 12th Floor
  Fort Lauderdale, Florida 33301
  Tel: (954) 525-4100
  Fax: (954) 525-4300